**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JOSHUA JAMES EDEN,**

      **Plaintiff,**

**v.**                              **Case No.: 2:16-cv-03703**

**NANCY A. BERRYHILL,**
**Acting Commissioner of**
**Social Security,[1]**

      **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief, requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 12, 13).

      The undersigned has fully considered the evidence and the arguments of counsel.

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **GRANTED,** to the extent it requests remand; the Commissioner's request for judgment on the pleadings be **DENIED;** the Commissioner's decision be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On January 28, 2013 and June 10, 2013, respectively, Plaintiff Joshua James Eden ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of August 12, 2012, (Tr. at 161, 164), due to "brain aneurysms; strokes; seizures; vertigo; personality disorder; manic depressant; bi-polar; migraines, dizziness and lightheadedness." (Tr. at 183). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 87, 95). Claimant then filed a request for an administrative hearing, (Tr. at 101), which was held on January 8, 2015, before the Honorable Peter Jung, Administrative Law Judge ("ALJ"). (Tr. at 29-52). By written decision dated January 22, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 14-24). The ALJ's decision became the final decision of the Commissioner on March 3, 2016, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which

2

Claimant filed a reply. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 26 years old at the time that he filed the instant applications for benefits, and 27 years old on the date of the ALJ's decision. (Tr. at 14, 161, 164). He has a high school education with one year of college and communicates in English. (Tr. at 34, 182, 184). Claimant has prior work experience as a cook, a laborer in manufacturing and construction, and a mechanic. (Tr. at 35-36, 184).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to

Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2014. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 12, 2012, the alleged disability onset date. (Tr. at 16, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "history of left frontal venous

4

angioma/venous malformation, migraine headaches, personality disorder, and depression." (Tr. at 16-17, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift up to 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 6 hours in an 8-hour day, and can sit for 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds or crawl. He can occasionally balance and stoop. He can frequently climb ramps and stairs, kneel, and crouch. He can never have jobs involving hazards such as machinery and heights. He must avoid occasional exposure to vibration. He must avoid frequent exposure to extreme cold, wetness, fumes, odors, dusts, gases and poor ventilation. He is limited to working simple, repetitive, and routine jobs without any production rate, pace or quotas. He is limited to superficial interaction with supervisors, co-workers, and the public. He would also be off task 10% of the workday.

(Tr. at 18-22, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1987, and was defined as a younger individual age 18-49; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 22, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant

numbers in the national economy, (Tr. at 23, Finding No. 10), including work as a folder, non-postal mail clerk, or marking clerk at the unskilled, light exertional level. (Tr. at 23). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 23-24, Finding No. 11).

IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ erred in three respects. First, Claimant argues that the ALJ failed to consider all of the significant medical evidence; in particular, Claimant's numerous visits to the emergency room triggered by severe and unrelenting migraine headaches. (ECF No. 12 at 9-11). Claimant contends that these visits corroborate the severity and persistence of his symptoms, yet the ALJ chose to ignore them. Second, Claimant alleges that the ALJ failed to perform an adequate step three analysis. (*Id.* at 11-13). According to Claimant, his migraine headaches should have been fully evaluated under Listing 11.03. While the ALJ mentioned Listing 11.03 in passing, he never actually compared Claimant's symptoms and limitations to the severity criteria of that listing. Lastly, Claimant criticizes the credibility assessment performed by the ALJ, stating that the assessment lacked an accurate and logical bridge between the evidence and the conclusion that Claimant was not fully credible. (*Id.* at 13-16).

In response, the Commissioner maintains that the ALJ acted reasonably by finding that Claimant was not disabled under the stringent requirements of the Social Security Act. (ECF No. 13 at 9). The Commissioner disagrees with Claimant's contention that the ALJ was not thorough in his analysis of the medical evidence, pointing out that the ALJ was not required to discuss every treatment record. (*Id.* at 10-12). As to Claimant's argument regarding the Listing, the Commissioner asserts that Claimant cannot show *per se* disability under any listed impairment. (*Id.* at 13-15). Finally, the Commissioner argues

6

that the ALJ's assessment regarding the reliability of Claimant's statements was performed precisely as required by Social Security rules and regulations, was sufficiently detailed, and was supported by substantial evidence. (*Id.* at 15-18). Therefore, the Commissioner contends that her decision denying benefits should be affirmed.

## V.    <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### *A. Treatment Records*

On October 11, 2011, Claimant was admitted to Camden Clark Medical Center for suicidal ideations. (Tr. at 371-79). Claimant reported that he had experienced "outbreaks" with drugs and alcohol, but had been clean for one year. Claimant expressed constant thoughts of self-harm. He described blacking out and destroying property, with no memory of the incident. He felt overwhelmed, depressed, uncomfortable around other people, and had mood swings and anger issues. Claimant also complained of feeling irritable and agitated. He was not eating well and had not slept in five days. Claimant reported having a history of mental health treatment, requiring hospitalization, as well as a history of cocaine and multiple substance abuse. He smoked three to six packs of cigarettes a day. (Tr. at 371). As for past medical history, Claimant stated that he had migraine headaches, for which he took Excedrin Migraine tablets as needed, and had suffered a spontaneous pneumothorax years earlier. A physical examination was conducted, with the results being unremarkable. (Tr. at 372-73). Claimant was diagnosed with depressive disorder, rule out major depression, recurrent/severe, without psychotic features; and rule out personality disorder. Claimant was admitted for observation and

treatment by the behavioral health unit. On October 18, 2011, he was discharged with a diagnosis of major depression, severe, without psychotic features; recurrent impulsive control disorder, not otherwise specified; and rule out intermittent explosive disorder. His Global Assessment of Functioning Score had increased from 30 at the time of admission to 55.[2] (Tr. at 378). At the time of his discharge, Claimant exhibited an improved mood. His prognosis was determined to be fair with continued outpatient treatment and compliance with same. Claimant was prescribed Depakote, Remeron, and Cipro and was scheduled for appointments at Westbrook Health Services. (Tr. at 379).

Nearly ten months later, on August 7, 2012, Claimant presented to Marietta Memorial Hospital complaining of headache and dizziness. (Tr. at 347-50). Claimant underwent a CT scan of the head and an MRI of the brain. The CT scan revealed two very tiny hyperdense foci in the left frontal lobe. The radiologist felt this finding was probably artifactual, but added that if Claimant had experienced a recent head injury, the finding could possibly reflect a very small axonal hemorrhagic shear injury. Otherwise, the CT scan was normal. The MRI, however, showed a venous angioma (an abnormal tangle of veins) in the left frontal lobe of the brain. There was punctate focus of an old hemorrhage or small cavernous hemagloma that abutted the venous angioma; however, no acute

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores of 21-30 reflect "behavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day, no job, home, or friends)." DSM-IV at 32. GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

hemorrhage was seen. (Tr. at 347).

On August 17, 2012, Claimant presented to the emergency room at Camden Clark Medical Center. He reported being involved in a motor vehicle accident and was complaining of dizziness and recurrent headaches. (Tr. at 369-370). His physical examination was unremarkable. A CT scan of Claimant's head was performed, which also revealed normal results. (Tr. at 398). Claimant was diagnosed with thoracic strain/sprain and discharged in stable condition.

Claimant presented to Marietta Memorial Hospital on September 25, 2012 for a CT scan of his head due to a history of severe headaches and venous angioma. (Tr. at 345-46). The CT scan showed two small hyperattenuated densities in the subcortical region of the left frontal lobe. (*Id.*). The scan appeared stable when compared with the prior study performed on August 7, 2012. There was no evidence of edema or atrophy.

On December 23, 2012, Claimant was admitted to Marietta Memorial Hospital ICU for treatment of intractable headache with chronic subacute hemorrhage due to a frontal venous angioma. (Tr. at 355-57). He also reported having experienced periods of numbness in his arms and legs throughout the prior evening. On examination, Claimant was alert and oriented with fluent and appropriate speech. His naming, repetition, and comprehension was normal. Claimant had a left holocranial headache. Muscle strength was measured 5-/5 throughout. Radiology imaging showed subacute blood enlarging in the area of the left frontal venous angioma; however, there was no significant midline shift or mass effect. A CT scan of the head revealed a slight increase in the acute density around the lesion.

A few days later, Barry Louden, M.D., performed a neurological consultation at the request of Claimant's treating physician. (Tr. at 356). Claimant reported that his headache

was improved, but he still had significant dizziness and felt like the room was spinning. On examination, Claimant was coherent, his speech was intact, and he was oriented in three spheres. His pupils were normal, his neck was supple, and there was no facial asymmetry. Claimant's deep tendon reflexes were 1+ in the arms and legs, and arm and leg strength was unremarkable. His carotid arteries were 1+, symmetric and synchronous. Dr. Louden mused that it was "difficult to account for dizziness based on the lesion in its current location;" although, Claimant did not appear to be seeking medication. (Tr. at 357). Dr. Louden prescribed Decadron and ordered an EEG. Claimant additionally underwent another CT scan of the head. (Tr. at 344). This scan showed a focal area of hyperattenuation in the left frontal lobe in the subcortical region, which was slightly decreased from the CT scan taken two days prior. Mild edema was seen around the area.

Throughout this admission, Claimant received Decadron and Antivert in addition to narcotic pain medication. CT scans showed no significant change in the small area of hemorrhage and encephalomalacie of the left frontal lobe. At the time of his discharge on December 27, 2012, Claimant was ambulating with a steady gait and following a normal diet. Claimant was advised to lift no more than ten pounds and refrain from strenuous activity. He was provided prescriptions for Decadron taper, Neurontin, Keppra, Meclizine and Percocet.

Claimant returned to Marietta Memorial Hospital on January 10, 2013 for an angiography of the brain and an electroencephalogram, the purpose of which was to evaluate for aneurysm due to Claimant's severe headaches. (Tr. at 343, 635). The results of both studies were unremarkable. (*Id.*).

Two days later, on January 12 2013, Claimant presented to Marietta Memorial Hospital, with complaints of worsening headache. (Tr. at 306-08). Claimant had been

evaluated in the hospital's emergency room earlier that day due to headache complaints and had been discharged; however, he returned when his symptoms increased. Dr. Anita Hernandez, the attending physician, suspected a transient ischemic attack ("TIA") and ordered a neurology consultation that was performed that same day by Jay Bauerle, M.D., (Tr. at 309-10). Dr. Bauerle noted that Claimant's prior medical history was positive for intracranial hemorrhage and childhood seizure disorder; however, Claimant had not experienced any seizures or had any anticonvulsant treatment since childhood.

On examination, Claimant appeared alert, demonstrating normal speech and logic. His neck was supple, and there was no meningismus or Lhermitte's sign. (Tr. at 352-53). Dr. Bauerle diagnosed headache that had improved with intravenous valproic acid followed by sumatriptan. Claimant was advised to continue taking Keppra and start to increase the dosage of Topiramate in one week. At discharge on January 13, 2013, Claimant was diagnosed with headache, leukocytosis, abnormal LFT-ALT shift, intracranial hemorrhage, seizure disorder, suicidal ideations, TIA, and tobacco abuse. (Tr. at 562-63). Claimant's medication regimen included Keppra, Sumatriptan, Percocet, Otalopram, Gabapentin, Meclizine, Pravastatin and Tramadol.

On February 8, 2013, Claimant presented to the emergency room at Marietta Memorial Hospital, complaining of headache, nausea, and dizziness. (Tr. at 548-56). Claimant reported that the headache began that morning and had gradually worsened throughout the day. He described it as a dull throbbing over his left eye with associated dizziness on standing and walking. On examination, Claimant demonstrated normal speech and affect, and he was oriented in three spheres. Claimant's muscle strength was 5/5 in both upper and lower extremities, and he could touch his finger to his nose normally on both sides. While in the emergency room, Claimant received Zofran and

Benadryl as well as a home dose of Keppra. He was discharged in stable condition.

Claimant returned to the emergency room at Marietta Memorial Hospital on March 6, 2013 with complaints of headache, nausea and dizziness. (Tr. at 540-47). Claimant reported to the emergency room physician that he had been out of medication for one week and could not afford to have his prescriptions filled. Therefore, his family physician told him to come to the emergency room. Claimant described his headache as a constant throbbing that had lasted for two hours and was located in the left frontal area. He only rated the pain as one on a ten-point scale, but indicated that it was unrelenting. On examination, Claimant's cranial nerves, motor and sensory functions were intact. Claimant's gait was steady and strength measured 5/5 in all extremities. Claimant could perform normal finger-to-nose and heel-to-toe movements bilaterally; he had normal Romberg's sign and normal rapid alternating movements; and no nystagmus. Claimant scored 15 on the Glasgow coma scale, which was normal. Claimant had negative Babinskis, bilaterally, with symmetric reflexes throughout. He was alert, oriented with clear speech, and demonstrated normal affect. A CT scan of Claimant's head was performed and showed no acute process. Claimant was counseled that he would need to get medication from his family physician and was told to consult with Dr. Ghodsi, a neurosurgeon. Claimant was discharged in stable, improved condition.

Om April 2, 2013, Claimant presented to the office of Dennis Newland, M.D., and his office nurse, Connie Tackett, LPN, for a new patient evaluation. Claimant's primary complaint was testicular mass. (Tr. at 385-86). Dr. Newland documented Claimant's history of headaches, seizures, and stroke. Dr. Newland also noted that Claimant received a considerable amount of medication for these conditions and was scheduled to see a neurosurgeon in the near future. Claimant's past medical history and problem list

included anxiety and depression. A review of systems and physical examination were unremarkable. Claimant was assessed with testicular pain, cerebral hemorrhage, and depression. Dr. Newland ordered an ultrasound for further investigation of the testicular pain, and prescribed Meclizine, Gabapentin, Percocet, and Keppra for headaches. Claimant was also prescribed Celexa for treatment of depression.

On April 16, 2013, Claimant presented to Abdi Ghodsi, M.D., for a neurosurgery consultation. (Tr. at 362-63).  Claimant complained of headache and dizziness with the pain primarily located in the left temporal area and behind the left eye. Claimant told Dr. Ghodsi that bright lights disturbed his vision and any increase in activity exacerbated his headaches. Claimant denied seizure activity. He reported that his symptoms were better controlled when he took the medication that had been prescribed for him by Dr. Bauerle. On examination, Claimant demonstrated 5/5 strength in all extremities. Hoffman's sign and clonus were absent. Finger-to-nose-to-finger testing, heel-shin cerebellar test bilaterally, rapid alternative movements bilaterally, fine motor coordination, and heel-to-toe straight line walking were all within normal limits. Rhomberg's sign was negative. Claimant was assessed with anomalies of the cerebrovascular system. Dr. Ghodsi documented that Claimant had been diagnosed with two prior intracerebral hemorrhages secondary to venous angioma. An MRI of the brain was ordered, and Claimant was advised to see Dr. Levy, Dr. Aldofer, or Dr. Calloway for possible stereotactic radiosurgery.

Claimant presented to Pars Neurosurgical Associates on April 24, 2013 for an MRI of the brain. (Tr. at 360-61). The MRI revealed a resolved left frontal hemorrhage with residual hemosiderin/blood breakdown products as well as a persistent developmental venous anomaly, described as a venous angioma, next to the prior hemorrhage. However, no mass lesion or acute intracranial process was seen. Claimant's assessment was

intracerebral hemorrhage and seizure disorder.

Claimant followed up with Charles Levy, M.D., on May 3, 2013, reporting headaches in the left frontal region and behind the left eye, memory loss, dizziness, nausea, sensitivity to lights, and headache exacerbation with any increase in activity. (Tr. at 358-59). Dr. Levy diagnosed Claimant with congenital arteriovenous malformation, chronic; daily headaches; and seizure disorder. Dr. Levy felt that Claimant would benefit from stereotactic radiosurgery. Therefore, he made an appointment for Claimant with Dr. Michael Galloway, a radiation oncologist.

Claimant was examined by Dr. Galloway on May 8, 2013. (Tr. at 393-94). Claimant's medical history included intermittent seizure disorder beginning at age five and vascular malformation in the left frontal region of the brain, which manifested as a venous angioma with an adjacent cavernous malformation. Claimant's symptoms had progressed to include dizziness, mild memory loss, frequent left frontal headaches, and seizure activity, which had last occurred in December 2012 and was associated with a small left frontal region hemorrhage. On examination, Claimant was alert and oriented in three spheres, and in no acute distress. The cranial nerves from II through XII were intact. There did not appear to be any motor or sensory deficit in the upper or lower bilateral extremities. Dr. Galloway diagnosed Claimant with symptomatic vascular malformation consistent with a cavernous malformation noted in the left frontal lobe. Claimant underwent radiosurgery at Camden Clark Medical Center on May 24, 2013 to treat the venous malformation. (Tr. at 390-92). Claimant did not experience any complications from the procedure. Follow-up appointments were scheduled with Dr. Levy and Dr. Galloway.

On May 30, 2013, Claimant returned to Camden Clark Medical Center for an MRI

of the brain due to his complaint of having a severe headache since radiation therapy. (Tr. at 380). The MRI revealed a stable examination. There was no sign of acute intracranial process; however, there was a small area of hemosiderin staining which was consistent with a venous angioma.

On June 3, 2013, Dr. Louden sent a letter to Dr. Levy summarizing Dr. Louden's evaluation of Claimant that day. (Tr. at 381). Claimant reported having holocephalic headaches five days per week with accompanying symptoms of pressure, photophobia, sonophobia, and nausea. However, Claimant's physical examination was unremarkable. He presented as alert and in no distress. His optic fundi were benign. Dr. Louden opined that Claimant's headaches were migrainous in nature, but were possibly triggered by his vascular malformation. Dr. Louden added Relpax to Claimant's medication regimen.

On June 10, 2013, Claimant was examined by Nurse Tackett and Dr. Newland for complaints of headaches accompanied by nausea, vomiting, and dizziness. (Tr. at 383-84). Claimant reported that he had been seeing a radiation oncologist for treatment of the headache pain and had one treatment remaining. Claimant stated that his headaches got so severe at times, he would vomit and become dizzy. Heat also exacerbated his head pain. Claimant reported that Percocet helped alleviate the pain. A review of systems was negative. Claimant's physical examination was also normal. Dr. Newland diagnosed Claimant with cerebral hemorrhage and headaches. He prescribed Percocet for Claimant's pain and referred him to Dr. Pantelidis for pain management.

On June 12, 2013, Claimant underwent a CT scan of the head at Camden Clark Medical Center. The results were unremarkable, showing no acute intracranial hemorrhage or process. (Tr. at 396). Claimant returned on July 29, 2013 for a repeat CT scan of the head. (Tr. at 395). The results were again unremarkable with no evidence of

15

an acute intracranial abnormality.

On August 5 and August 26, 2013, Claimant saw Nurse Tackett and Dr. Newland for complaints of abdominal pain. (Tr. at 597-600). At both visits, Dr. Newland continued Claimant's prescription of Percocet to treatment his headaches.

Claimant presented to the emergency room at Marietta Memorial Hospital on September 2, 2013, with complaints of headache, nausea, and dizziness. (Tr. at 522-27). Claimant told the emergency room physician that his headaches began ten months earlier, and he treated them with Percocet. Claimant had used all of his medication and needed more to last him until he could get an appointment with his primary care physician. Claimant was given a refill of his pain medication; however, Dr. William Charles, the examining physician, advised Claimant that he would not provide any more refills. Dr. Charles told Claimant to follow up with his primary care physician.

On September 5, 2013, Claimant was seen at Dr. Newland's office by Hope Schultz, LPN, and Veronica Murphy, Family Nurse Practitioner, for treatment of bronchitis. (Tr. at 595-96). At this visit, Claimant received a refill of Percocet for headache pain.

On October 23, 2013, Claimant presented to Nurse Tackett and Dr. Newland for follow-up care. (Tr. at 589-91). Claimant informed the doctor that he had been in a motor vehicle accident and was treated at the hospital for back pain; however, the back pain had since improved. A review of systems was positive for fatigue, nasal congestion, back pain, and headaches. On examination, Claimant demonstrated normal gait and station. His cranial nerves were likewise normal. Claimant was oriented with appropriate mood and affect. Claimant indicated that he needed a refill of Percocet for treatment of his headache pain. Dr. Newland agreed to refill the prescription, remarking that Claimant used the Percocet "sparingly." Dr. Newland also prescribed Celexa for treatment of depression. Dr.

Newland noted that Celexa appeared to offer Claimant measurable relief from his depression.

On December 8, 2013, Claimant sought treatment for headache pain at the emergency room of Camden Clark Medical Center. (Tr. at 470-71). A CT scan of Claimant's head was performed and showed no abnormality other than the left frontal lobe white matter cavernous angioma, which was faintly visible and unchanged. (Tr. at 468). Claimant's physical examination was unremarkable. He was diagnosed with headache and nicotine abuse and was discharged in stable condition.

Due to Claimant's history of vascular anomaly and headaches, an MRV and MRA of the head were performed at Camden Clark Medical Center on December 27, 2013. (Tr. at 421-22). The MRV study showed flow in the superior sagittal sinus and the transverse sinuses and sigmoid sinuses. The transverse sinus on the right was believed to fill via the internal cerebral vein on the right, representing an anatomical variation in development. There was no venous abnormality seen, although Claimant had a history of venous angioma in the white matter of the left frontal region. The MRA was considered to be essentially normal with a small focus of hemosiderin deposition in the left frontal lobe that was similar to findings from a prior study.

Claimant was seen in the emergency department at Camden Clark Medical Center on January 8, 2014 for complaints of headache pain. Claimant reported that his headache was slowly improving. His current medications included Vicoden, Meclizine, Gabapentin, and Celexa. Claimant returned on January 26 with complaints of severe headache. (Tr. at 418-19). A CT scan of his head was performed, with no abnormalities detected other than the previously diagnosed angioma. (Tr. at 416). Claimant's paranasal sinuses were clear. Claimant was diagnosed with acute migraine headache, was given a prescription for

17

Vicodin, and was told to follow up with Dr. Ghodsi.

On January 27, 2014, Claimant presented to Nurse Tackett and Dr. Newland with complaints of intermittent pain in his jaw for the past two weeks. (Tr. at 587-89). He reported having been seen in the emergency room for headache pain the night before, but was not offered treatment for the pain in his jaw. A review of systems was positive for fatigue, headache, nasal congestion and back pain. A physical examination was performed and was found to be unremarkable, except for swollen gums on the left lower and upper jaw. Claimant was assessed with jaw pain and headache. Dr. Newland prescribed Cephalexin and Diclofenac for treatment of the jaw pain and advised Claimant to make an appointment with a dentist. Dr. Newland noted that Claimant needed a refill of Percocet for headache pain, again remarking that Claimant seemed to use the medication "sparingly."

On March 2, 2014, Claimant presented to the Emergency Department at Camden Clark Medical Center with complaints of "same HA [headache] as usual." (Tr. at 414-15). Claimant reported he took a Percocet at five p.m. and that was his last one. Claimant noted that his headache was accompanied by sensitivity to light, noise, and movement. His physical examination was normal. After receiving treatment in the emergency room, Claimant reported the pain was improving. He was diagnosed with headaches and discharged.

On May 6, 2014, Claimant presented to the emergency room at Marietta Memorial Hospital with complaints of a headache accompanied by nausea and vomiting. (Tr. at 514-21). Claimant described the pain as sharp and unrelenting, rating an eight on a ten-point pain scale. Claimant's examination was normal, including his neurological assessment. Claimant was given Morphine, Reglan, and Benadryl to treat his pain. A CT scan of his

18

head was performed, which showed no acute intracranial abnormality. (Tr. at 611). Claimant was assessed with headaches and was released after treatment. He returned approximately two weeks later, on May 21, for the same complaints of headache, associated with nausea, vomiting, and photophobia. (Tr. at 506-13). While at the emergency room, Claimant received Benadryl, Reglan, and Morphine. A CT scan of the head was performed which was normal, with no change since a prior scan two weeks earlier.

Claimant returned to the emergency room at Marietta Memorial Hospital on September 10, 2014 for complaints of headache. (Tr. at 500-05). A CT of the head was performed, which showed bilateral sinus disease, worse on the right, but no acute intracranial process. Claimant was treated with Benadryl, Reglan, and Morphine. He was discharged in stable condition.

Claimant presented to Dr. Newland on September 26, 2014, reporting daily headaches; although, Claimant stated they were "not as severe as they once were." (Tr. at 585-86). He also complained of fatigue, nasal congestion, sore throat, and back pain. Claimant's physical examination was normal. He demonstrated a normal gait and station, as well as an appropriate mood and affect. Dr. Newland advised Claimant to continue taking Percocet for pain and follow up as needed.

On October 23, 2014, Claimant presented to the emergency room at Marietta Memorial Hospital after dropping a big piece of steel on his foot. (Tr. at 494-98). Claimant denied having any symptoms other than left foot pain. His physical examination was normal except for his left foot, which was cool, pale, and cyanotic, with evidence of bruising, swelling, and deformity. An x-ray was negative for fractures, but Claimant was told to get additional films in about one week if his foot did not improve. He was given an

ace wrap and post-op shoe and was instructed to elevate his foot and apply ice.

Claimant returned to the emergency room at Marietta Memorial Hospital on October 31, 2014 with complaints of worsening headache for the past two days. (Tr. at 479-85). Claimant also reported a history of photophobia and depression. He was seen by Siva Murthy, M.D., the attending physician. Dr. Murthy noted that Claimant had received radioablation for a cerebral bleed two year earlier. Claimant appeared alert and oriented, although in mild distress. Other than head pain, Claimant's physical examination was normal. A CT scan of Claimant's head showed no acute intracranial abnormality. The radiologist saw mild low-attenuation within the subcortical white matter of the left frontal lobe, which appeared to have remained stable when compared with a prior CT scan taken in January 2013. The radiologist felt the finding was most likely related to a prior hemorrhage and known developmental venous anomaly detected on an MRI of the brain also completed in January 2013. (Tr. at 489). At this visit, Claimant's current medications included Neurontin, Keppra, Antivert, Celexa, Pravachol, Topomax, Ultram, Percocet, Imitrex, Tylenol #3, and ibuprofen. He was diagnosed with headache and provided prescriptions for Phenergan and Percocet.

The following month, on November 24, 2014, Claimant appeared at the emergency room of Marietta Memorial Hospital, complaining of a headache. (Tr. at 472-76). Dr. Murthy examined Claimant, noting that he was status post radioblation of the left frontal area for an arteriovenous malformation several years earlier and had been "doing well until recently." Claimant appeared alert and oriented with normal mood and affect, but indicated that his headache was persistent and was worsening. A physical examination was unremarkable. A CT scan of Claimant's head was performed and showed findings identical to those taken the prior month. Claimant was advised to follow-up with his

neurologist if his symptoms worsened. In the alternative, he could return to the hospital for an MRI. Claimant was discharged in good condition.

Claimant presented to Nurse Tackett and Dr. Newland on December 19, 2014 for refills of pain medication and Celexa. (Tr. at 638-40). Claimant advised Dr. Newland that he had been seen in the emergency room for pain related to intractable headaches and associated vomiting. He was diagnosed on these visits with headaches, depression, and anxiety. Claimant also reported that he was seeing a neurosurgeon, who planned to schedule an appointment for Claimant at the Cleveland Clinic; however, as of this visit, the appointment had not been scheduled. A review of systems was positive for fatigue, nasal congestion, sore throat, back pain, headaches and depression. Claimant's physical examination was unremarkable. Due to an increase in Claimant's headaches, and his habit of using the drug sparingly, Dr. Newland provided Claimant with another prescription for Percocet. Dr. Newland indicated that Claimant was dealing with a very serious chronic illness, which would cause him to feel depressed. Accordingly, Dr. Newland increased Claimant's prescription of Celexa. He noted that Claimant's anxiety appeared to be stable. Given that Claimant was still not scheduled at the Cleveland Clinic, Dr. Newland intended to work on getting him an appointment.

### B. Evaluations and Opinions

On September 26, 2013, Paul A. Dunn, Ph.D., performed an adult mental profile evaluation and consultation at the request of the West Virginia Disability Determination Service. (Tr. at 404-12). The consultation included a clinical interview, mental status examination, and administration of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV"), the Neurobehavioral Cognitive Status Examination ("COGNISTAT"), and the Beck Depression Inventory. Dr. Dunn noted that Claimant arrived on time for the

appointment, having driven himself to the location. He appeared to be casually dressed with average grooming and hygiene.

In conjunction with performing the evaluation, Dr. Dunn reviewed Claimant's records, including his medical records and records prepared as part of the disability determination process. During the clinical interview, Claimant reported that he quit school in the 11th grade, because he did not like being around people. He obtained a GED and attended college for a year and a half, taking criminal justice courses. Claimant dropped out of college when his girlfriend became pregnant. Claimant indicated that he never married his girlfriend, and he had no parental rights, at his request. Claimant had a second child with another girlfriend. With respect to his work history, Claimant stated that he had prior jobs repairing tractors, making pizzas, and repairing valves. He had quit three jobs, once after a confrontation with his supervisor and twice because he "got mad" over various incidents.

Claimant listed a number of complaints, including seizures, vertigo, migraines, bipolar disorder, and personality disorder. He described having problems with his temper, letting his anger build until he blew up. He related episodes of acting out, which included him punching a wall, breaking a television, punching and throwing things at his dogs, and setting fires. He admitted to suicidal thoughts, but denied ever having hurt another person. Claimant complained of disturbed sleep and decreased appetite, indicating that he could go two or three days without eating.

In regard to past mental health treatment, Claimant reported having mental health issues beginning at age eight when he tried to hang himself. He received inpatient treatment at that time. From then until age eighteen, Claimant received medication management and mental health counseling. However, he still had anger outbursts and

eventually stopped taking the medication. Claimant began drinking alcohol at age eighteen, consuming a twelve pack of beer and half of a fifth of whiskey every day. After his son was born, he drank heavily only on the weekends and reported that he had since stopped drinking alcohol altogether. When Claimant was drinking, he also used marijuana and cocaine. Claimant experienced legal problems, including being charged with domestic assault, public intoxication, shoplifting, destruction of property, and contributing to the delinquency of a minor.

On mental status examination, Claimant demonstrated restless motor activity, shaking his right leg throughout most of the evaluation. Claimant smiled during the examination, although at times, he smiled inappropriately. His mood wavered between being depressed and being euphoric with an overall labile affect. Claimant was oriented to person, place, and day of the week; however, not to the date of the examination or the time of day. Claimant's stream of thought evidenced some flight of ideas and rambling, with an attempt to stay goal oriented, but sometimes going off track; nonetheless, there was no evidence of thought disorder. Claimant's concentration and pace were within normal limits, although his persistence was mildly deficient based upon his difficulty with making consistent effort during the objective testing. Claimant's recent and remote memory was found to be moderately deficient, and his immediate memory was severely deficient as evidenced by his ability to recall only one of four words immediately after they were presented to him. Social function was found to be mildly deficient. Claimant's daily activities included driving around, listening to the car radio, and driving down to the river to think. He told Dr. Dunn he could prepare simple meals in the microwave.

On the WAIS–IV, Claimant scored 80 in verbal comprehension, 92 in perceptual reasoning, 97 in working memory, 74 in processing speed, with a full scale IQ of 82,

placing him in the low-average range of intellectual functioning. His processing speed was quite slow, suggesting difficulty with handling visual stimuli. Dr. Dunn opined that Claimant's test results were likely consistent with his educational experience and overall work pattern. Dr. Dunn felt the test results were internally consistent, despite some inconsistent effort on Claimant's part, and thus constituted a valid estimate of his IQ level. On the COGNISTAT, all of Claimant's scores fell within the normal limits of the subtests. Dr. Dunn felt that Claimant's scores did not reveal any gross deficits in his overall neurocognitive status.

Dr. Dunn diagnosed Claimant with major depressive disorder, recurrent, severe, without psychotic features; intermittent explosive disorder; and personality disorder with some eccentric thought and behavior patterns suggestive of schizotypal traits. Claimant was given a GAF score of 55. Dr. Dunn indicated that Claimant's prognosis was poor due to lack of treatment; however, he believed Claimant was capable of managing his own funds.

On October 8, 2013, Holly Cloonan, Ph.D., completed a Psychiatric Review Technique form. (Tr. at 66-68). Dr. Cloonan considered Claimant to have evidence of impairment under Listing 12.04 (affective disorders), Listing 12.08 (personality disorders), and Listing 11.04 (central nervous system disorder). She opined that Claimant had moderate limitations in activities of daily living, maintaining social function, concentration, persistence and pace; however, Claimant had no repeated episodes of decompensation. Dr. Cloonan did not find evidence to establish the paragraph "C" criteria. Under the additional explanation section of the form, Dr. Cloonan considered Claimant's history of mental health problems in childhood and as an adolescent; however, she found no mental health documentation from October 2011 through June 2013; a time

period when Claimant was receiving medication for depression prescribed by his primary care physician. Dr. Cloonan felt that although neuropsychological results revealed Claimant had low average intellectual functioning with an overall slow processing speed, the findings were not consistent with a cognitive disorder. Dr. Cloonan added that Claimant might have moderate deficits involving consistency, persistence, and pace associated with slow processing speed and his other psychiatric symptoms. She noted that the consultative examiner described Claimant's affect as inappropriate at times, which was consistent with a personality disorder. Claimant reported a history of trouble getting along with others, as well as instances of dramatic loss of temper. Dr. Cloonan opined that Claimant's severity of symptoms could not be completely substantiated by the objective medical records and, consequently, found Claimant to be only partially credible. However, she found Claimant to be mostly credible "from a mental standpoint" based upon the consistency between his alleged psychological symptoms and the findings of the consultative examiner.

By report of same date, Dr. Cloonan completed a Mental Residual Functional Capacity Assessment. (Tr. at 70-72). She found that Claimant was not significantly limited in his ability to remember locations and work-like procedures or understand and remember very short and simple instructions; however, he was moderately limited in his ability to understand and remember detailed instructions. She opined that Claimant was not significantly limited in his ability to carry out very short and simple instructions, sustain ordinary routine without special supervision, or make simple work-related decisions. In contrast, he was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary

tolerances, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistence pace without an unreasonable number and length of rest periods. Claimant was moderately limited in his ability to respond appropriately to changes in the work setting, but he was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals, or make plans independently of others. Dr. Cloonan summarized Claimant's RFC by stating that he had the ability to learn, remember, and perform routine work-like activities involving simple instructions at a reasonable pace in settings that did not require him to meet production line schedules, or have more than superficial and occasional interaction with others.

On October 9, 2013, Cindy Osborne, D.O., completed a Physical Residual Functional Capacity Assessment. (Tr. at 68-70). Dr. Osborne found Claimant could occasionally lift twenty pounds; frequently lift ten pounds; stand, walk and/or sit about six hours in an eight hour workday; and had unlimited ability to push and/or pull. In support of her conclusions, Dr. Osborne noted that Claimant complained of migraine headaches and had a history of intracranial hemorrhage due to venous angioma. After undergoing radiosurgery, Claimant continued to complain of headaches; although, there were no focal deficits. Claimant demonstrated a normal gait and station; he received medication for treatment of headaches and according to a recent psychological examination, Claimant's activities of daily living did not indicate any mention of headaches or limitations. She found Claimant could occasionally balance and stoop, had unlimited ability to climb ramps and stairs, kneel, crouch or crawl; however, he should

never climb ladders, ropes or scaffolds. Claimant had no manipulative, visual, or communicative limitations. As to environmental limitations, Dr. Osborne felt Claimant had unlimited ability for exposure to heat, wetness, humidity, noise, fumes, odors, dusts, gases, or poor ventilation, but should avoid concentrated exposure to extreme cold, vibration or hazards, such as machinery or heights.

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is

27

"not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  Discussion

Claimant raises three challenges to the Commissioner's decision. Two of Claimant's concerns are addressed together, and the final issue is considered separately below.

### A.  Listing 11.03 and the ALJ's Consideration of the Records

Claimant contends that the ALJ failed to fully consider his migraine headaches under Listing 11.03. The Commissioner responds that Claimant failed to demonstrate disability under any of the listed impairments. While the Commissioner's position may ultimately prevail, the decision in this case must be reversed and remanded. A review of the written decision clearly demonstrates that the ALJ either erred in his step three analysis of Claimant's migraine headaches, or he failed to provide an explanation of his analysis sufficient to enable judicial review.

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed

with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

"Where a claimant suffers from an unlisted impairment, the ALJ must compare the claimant's impairment with an analogous listed impairment." *McShane v. Berryhill*, No. CV 15-5137, 2017 WL 440269, at *3–4 (W.D. Ark. Feb. 1, 2017) (citing 20 C.F.R. § 404.1526). In this case, the ALJ compared Claimant's venous angioma and related headaches to the impairments described in Section 11.00 of the Listing. Section 11.00 of the Listing pertains to Neurological Disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00. In January 2017, Section 11.00 was substantially revised, *inter alia,* reserving Listing 11.03. *Id.* However, at the time of the ALJ's decision, Listing 11.03 stated the following:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Id.* at § 11.03 (January 1, 2015). After making the comparisons, the ALJ concluded that Claimant did not meet or equal any listed impairment in Section 11.00, including 11.03, because "he has no evidence of epilepsy, central nervous system vascular accident, benign brain tumor (evaluated under 11.02, 11.04, 11.04 or the criteria of the affected body

system) parkinsonian syndrome, cerebral palsy, spinal cord or nerve root lesions, multiple sclerosis, amyotrophic lateral sclerosis, anterior poliomyelitis, myasthenia gravis, muscular dystrophy, peripheral neuropathies as described in 11.04B, subacute cord degeneration with disorganization of motor function, or degenerative disease not listed elsewhere." (Tr. at 17).

In short, the ALJ determined that Claimant's impairments did not *meet* Listing 11.03, because Claimant did not have epilepsy. That finding, while correct, was incomplete. The ALJ should have proceeded to compare Claimant's migraine headaches to Listing 11.03 to determine whether they were *equivalent* to the criteria of that listing. He erred either by failing to do so, or by failing to articulate the analysis. *See Kaiser v. Colvin,* No. 1:14-CV-01480-SEB, 2015 WL 4138263, at *5 (S.D. Ind. July 7, 2015) (finding that the ALJ "misse[d] the mark" when he concluded that claimant's migraine headaches did not meet or equal Listing 11.03 because "Plaintiff was never diagnosed with epilepsy" and "[n]o seizures were ever documented."). Because this Court is precluded from conducting the analysis of medical equivalency that should have been performed by the ALJ, the Court is unable to ascertain whether the ALJ's step three finding is supported by substantial evidence. *See Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). It has never been the province of the district court "to engage in these [fact-finding] exercises in the first instance." *Id. (*quoting *Radford v. Colvin,* 734 F.3d 288, 296 (4th Cir.2013)). As stated in *Fox,* "[o]ur circuit precedent makes clear that it is not [the Court's] role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."

Claimant correctly argues that the Listing contains no specific entry for migraines or other chronic headaches; consequently, "the SSA routinely considers these

impairments under the criteria for Listing 11.03." *Cooper v. Berryhill,* No. 115CV1740SEBMJD, 2017 WL 1055078, at * 3 (S.D. Ind. Mar. 21, 2017). The SSA's Program Operations Manual System ("POMS") at DI 24505.015(B)(7)(b) likewise identifies Listing 11.03 as the most "closely analogous" listed impairment to chronic migraine headaches. *McShane,* 2017 WL 440269, at *3; *see, also, Mann v. Colvin,* 100 F.Supp.3d 710, 719 (N.D. Iowa 2015); *Loree v. Colvin,* No. 2:15-CV-251-JMC, 2016 WL 5107028, at *6 (D. Vt. Sept. 20, 2016) (noting that the *SSA's National Q&A 09-036 c*onfirms that "the most appropriate Listing for consideration in [headache] cases is Listing 11.03"). Apparently, the ALJ recognized this, as he properly considered Listing 11.03. However, his analysis fell short.

In the POMS at DI 24505.015, the SSA provides the following example of how the analysis should be performed to determine if a claimant's migraine headaches medically equal Listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, nonconvulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

Courts discussing the proper way to evaluate headaches provide further guidance on how migraine headaches may be examined for equivalency to Listing 11.03. *See Dunlap v. Colvin,* No. 15-CV-02139-NYW, 2016 WL 5405208, at *9 (D. Colo. Sept. 28, 2016); *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682, at *10 (D. Ariz. Dec.

32

16, 2014); *Mesecher v. Berryhill*, No. 4:15-CV-0859-BL, 2017 WL 998373, at *3–5 (N.D.

Tex. Mar. 15, 2017). In *Mesecher,* the court suggested using the following criteria:

> Migraine headaches, documented by detailed description of a typical headache event pattern, including all associated phenomena, e.g., premonitory symptoms, aura, duration, intensity, accompanying symptoms, and treatment; occurring more frequently than once weekly, counting characteristic headache events. With (1) alteration of awareness, which means a condition of being inattentive, or not cognizant of one's surroundings and external phenomena as well as one's personal state or (2) significant interference with activity during the day that may result from, e.g., a need for a darkened, quiet room; lying down without moving; or a sleep disturbance that impacts on daytime activities.

*Id.* at 4. A cursory examination of the record in this case confirms that Claimant presented

sufficient findings and symptoms to merit an examination of medical equivalency under

Listing 11.03. Claimant frequently complained of having persistent, throbbing headaches,

with associated photophobia, sonophobia, nausea, vomiting, and dizziness. He was

ultimately diagnosed with migraine headaches by a neurologist, who further opined that

Claimant's headaches were probably triggered by a well-documented venous

malformation in the left frontal lobe of his brain. Claimant underwent radiation oncology

treatments and took multiple medications to decrease his headaches and dizziness, with

varied success. He was admitted to the ICU in December 2012 for intractable headaches,

and, over a two and one half year period. made numerous visits to the emergency room

and treating physicians for complaints of chronic headache pain and accompanying

symptoms. Therefore, the undersigned **FINDS** that the ALJ erred at step three of the

sequential process, and the case should be remanded to allow the ALJ to determine if the

medical findings and symptoms associated with Claimant's migraine headaches equal the

severity criteria of Listing 11.03.

      With respect to Claimant's related challenge regarding the attention given by the

ALJ to Claimant's emergency room records, the undersigned **FINDS** that a proper evaluation under Listing 11.03 will certainly require the ALJ to closely reexamine the medical records, including the emergency room records. Consequently, further discussion of this challenge is unnecessary.

### B. Credibility Assessment

Claimant argues that the ALJ failed to fairly and adequately measure the reliability of Claimant's statements regarding the persistence and severity of his migraine symptoms. An ALJ evaluates a claimant's report of symptoms using a two-step process. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[3] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to

---

[3] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which the parties relied on in their memoranda. The undersigned finds it appropriate to consider Claimant's challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can

36

assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ considered Claimant's statements using the two-step process required by the ruling and regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 19). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). The ALJ provided three reasons for discounting Claimant's credibility: (1) Claimant's statements were not supported by objective evidence; (2) his treatment was

37

conservative; and (3) his treating physician documented Claimant's use of Percocet as "sparingly." (Tr. at 20-21). "While courts generally afford significant deference to an ALJ's credibility determination, an ALJ must be particularly diligent in making such determinations regarding migraine headaches because laboratory tests cannot prove their existence." *Means v. Colvin*, No. 2:15-CV-01107-TFM, 2016 WL 3386814, at *5 (W.D. Pa. June 20, 2016). As the *Means* court points out, "[b]rain scans and physical examinations cannot detect migraine headaches." *Id.* (citations omitted). Given the absence of determinative diagnostic testing, physicians often make the diagnosis based solely upon the patient's reported symptoms. *Id.* Consequently, the ALJ should bear in mind that, with migraine headaches, a lack of objective findings is not indicative of the severity of symptoms.

Moreover, what the ALJ considered "conservative" treatment in this case may not have been conservative, but may simply have been the extent of treatment available to Claimant. Migraine headaches are generally treated with medications, including pain relievers; triptans and other migraine drugs; and preventative therapies, like anti-depressants, anti-seizure medications, cardiovascular drugs, and Botox.[4] As the records demonstrate, at various times, Claimant received all of these different types of medications, with the exception of Botox. Therefore, while an ALJ may certainly consider a claimant's conservative treatment as a factor in assessing credibility, the ALJ in this case concluded, without explanation and without a clear factual basis, that Claimant's treatment with medications alone was "conservative."

---

[4] *See Migraine,* National Center for Biotechnology Information, U.S. National Library of Medicine, at www.ncbi.nlm.nih.gov.pubmedhealth/PMH0072557; *also Migraine Diagnosis and Treatment* © Mayo Foundation for Medical Education and Research.

Finally, the ALJ emphasized the comments by Dr. Newland, Claimant's treating physician, regarding Claimant's judicious use of Percocet to suggest that Claimant was not in as much pain as he claimed. However, the comments should be interpreted in context. Dr. Newland was obviously documenting a rationale for his decision to continue Claimant on an opioid pain reliever notwithstanding the recent widespread attention concerning systemic opioid abuse. Moreover, Percocet was not the only pain medication prescribed to Claimant. During the two and one half years of treatment documented in the record, Claimant also received prescriptions for Vicodin, Ultram, Tramadol, Diclofenac, and Tylenol #3, which are all pain relievers, and was given Morphine and additional Percocet at his emergency room visits. In addition, he was prescribed Imitrex and Relpax, medications designed to the relieve migraine symptoms. Thus, by isolating and focusing only on the Percocet prescribed by Dr. Newland, the ALJ created a skewed picture of Claimant's reliance on pain relievers.

Although the ALJ gave what might be legitimate reasons for discounting Claimant's credibility, his discussion simply does not demonstrate that he considered the nuances associated with migraine headaches. Courts have struggled to find accurate ways to assess the credibility of a claimant with migraine headaches. *See, e.g., Means,* 2016 WL 3386814, at *5. No clear-cut guidelines unique to migraine headaches exist, and the issue has not been explicitly addressed by this circuit. However, courts in other jurisdictions have considered a variety of factors when gaging the severity and persistence of migraine headache symptoms, including, for example:

> [1] Whether the claimant has been diagnosed with migraines; [2] whether the claimant has received treatment and medication; [3] the length of the history of complaints and treatment relating to migraines; [4] the alleged severity and frequency; [5] the symptoms the claimant alleges the migraines

cause; and [6] whether the record contains any statements from doctors questioning the alleged frequency or severity.

*Kulbacki v. Colvin*, 2016 WL 2609984, at *6 (W.D. Pa. May 6, 2016). Significantly, the assessment of a claimant's credibility should be tailored to the specific impairments alleged and should consider all of the evidence in the record, not just the medical evidence. In this case, the ALJ may have placed too much weight on the lack of objective medical findings and not enough weight on other factors significant to determining credibility. *See Taylor v. Astrue*, No. 7:10-CV-149-FL, 2011 WL 2669295, at *4 (E.D.N.C. May 23, 2011), *report and recommendation adopted in part,* No. 7:10-CV-I49-FL, 2011 WL 2669290 (E.D.N.C. July 7, 2011) (collecting cases) (finding that the ALJ's heavy reliance on objective evidence in assessing the credibility of a claimant's statements regarding migraine headaches was erroneous "as migraines cannot be diagnosed or confirmed through laboratory or diagnostic testing."). Accordingly, the undersigned **FINDS** that the ALJ should reconsider Claimant's credibility, taking into account all of the evidence, and provide an explanation of the analysis that addresses the specific characteristics of migraine headaches.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for summary judgment, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further

administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** March 28, 2017

Cheryl A. Eifert
United States Magistrate Judge